# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| NORTHEAST IOWA CITIZENS FOR CLEAN WATER,<br><br>      Plaintiff,<br><br>vs.<br><br>AGRIPROCESSORS, INC.,<br><br>      Defendant.<br>_____<br><br>UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>AGRIPROCESSORS, INC.,<br><br>      Defendant. | No. 04-CV-1037-LRR<br><br><br><br>**ORDER** |

_____

## *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*    *BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      *A.*    *United States's Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      *B.*    *AgriProcessors's Answer* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      *C.*    *Consolidation with Citizens' Suit* . . . . . . . . . . . . . . . . . . . . . . 4

      *D.*    *Settlement Negotiations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      *E.*    *Consent Decree* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*III.*   *REVIEW OF CONSENT DECREE* . . . . . . . . . . . . . . . . . . . . . . . . . . 8

|   | A. | *Legal Standards* | 8 |
|---|----|-------------------|---|
|   | B. | *Analysis* | 9 |
|   |    | 1. *Procedural Fairness* | 10 |
|   |    | 2. *Substantive Fairness, Reasonableness and Adequacy* | 12 |
|   |    | 3. *Conclusion* | 16 |
| IV. | **DISPOSITION** | | 16 |

## I. INTRODUCTION

The matter before the court is the Motion to Enter Proposed Consent Decree ("Motion") (docket no. 51), filed by the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA").

## II. BACKGROUND

### A. United States's Complaint

On December 1, 2004, the United States, on behalf of the EPA, filed a Complaint against Defendant AgriProcessors, Inc. ("AgriProcessors"). The Complaint alleges that AgriProcessors repeatedly violated various federal environmental laws, including the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*,[1] the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.*, and the Clean Air Act ("CAA"), 42 U.S.C. § 7470 *et seq.*

According to the Complaint, AgriProcessors owns and operates a kosher meat processing plant ("Plant") in the City of Postville, Iowa ("City"). The Plant produces wastewater and uses anhydrous ammonia.

AgriProcessors discharges its wastewater to the City's Publicly Owned Treatment

---

[1] The Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, Pub. L. 95-217, 91 Stat. 1566 (Dec. 27, 1977) and the Water Quality Act of 1987, Pub. L. 100-4, 101 Stat. 7 (Jan. 6. 1987).

Works ("POTW"). The POTW is a controlled-release, four-cell lagoon system. It does not mechanically treat water, but instead relies on biological processes to reduce the level of pollutants in the wastewater over time. The POTW was designed to retain wastewater for 180 days to ensure adequate treatment. The POTW discharges into Hecker Creek, and then to the Yellow River, in northeast Iowa.

The State of Iowa, operating under an EPA-approved program, issued a National Pollutant Discharge Elimination System permit ("Permit") to the City. The Permit limits what AgriProcessors can release into the POTW ("pretreatment effluent limitations") and what the City can release into Hecker Creek ("final effluent limitations"). Since 1996, the Permit has contained pretreatment effluent limitations on flow, five-day biochemical oxygen demand ("$BOD_5$"), total suspended solids ("TSS"), pH, chlorides, and oil and grease. The Permit contains final effluent limitations for flow, five-day carbonaceous biochemical oxygen demand ("$CBOD_5$"), TSS and pH.

In addition to discharging wastewater, the Plant uses large quantities of anhydrous ammonia.[2] Various federal environmental laws required AgriProcessors to do two things: (1) annually report the amount of anhydrous ammonia it used and (2) develop and implement a risk management program, including a hazardous assessment, a prevention program and an emergency response program.

Count I of the Complaint alleges that, over approximately five years, AgriProcessors exceeded the Permit's pretreatment effluent limitations for flow, $BOD_5$, TSS and chlorides, in violation of 33 U.S.C. §§ 1311 and 1317 and 40 C.F.R. § 403.5. Count II alleges that AgriProcessors's discharges to the POTW caused the City to violate

---

[2] EPCRA defines anhydrous ammonia as an "extremely hazardous substance," 42 U.S.C. § 11022 and 40 C.F.R. § 370.2, and a "toxic chemical," 42 U.S.C. § 11023 and 40 C.F.R. § 372.65.

3

the Permit's final effluent limitations for flow, $CBOD_5$, TSS and pH, in violation of 33 U.S.C. §§ 1311 and 1317 and 40 C.F.R. § 403.5.  Count III alleges that AgriProcessors failed to properly submit a completed emergency and hazardous chemical inventory form for the calendar years 1998, 1999, 2000 and 2001, in violation of 42 U.S.C. § 11022(a) and 40 C.F.R. Part 370, Subpart B.  Count IV alleges that AgriProcessors failed to properly submit a Form R for anhydrous ammonia for calendar year 1998, in violation of 42 U.S.C. § 11023 and 40 C.F.R. Part 372.  Count V alleges that AgriProcessors failed to develop and implement a risk management program or submit such program to the EPA, in violation of 42 U.S.C. § 7412(r) and 40 C.F.R. Part 68.  The United States seeks injunctive relief and civil penalties.

### B.  *AgriProcessors's Answer*

On April 7, 2005, AgriProcessors filed an Answer.  AgriProcessors denies the substance of the United States's Complaint.

### C.  *Consolidation with Citizens' Suit*

On December 14, 2004, a local environmental group, Northeast Iowa Citizens for Clean Water ("NICCW"), filed a motion to consolidate the suit against the United States against AgriProcessors with *NICCW v. AgriProcessors, Inc.*, No. 04-CV-1037-LRR (N.D. Iowa) ("Citizens' Lawsuit").  In the Citizens' Lawsuit, NICCW asserts a claim under the CWA against AgriProcessors, which is similar to the United States's CWA claims.  However, NICCW also alleges that AgriProcessors stored and applied paunch[3] waste without a permit, in violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, and maintained an open dump, in violation of Iowa Code § 455B.307.  On

---

[3] "Paunch" is defined as "[a]n animal's entrails (esp. the stomach)."  Oxford English Dictionary _____ (draft rev. ed. 2005).

4

January 11, 2005, the court granted NICCW's motion and consolidated the two cases under the instant case number.

### D. *Settlement Negotiations*

The United States and AgriProcessors unsuccessfully attempted to settle their dispute before the United States filed the Complaint on December 1, 2004. On that date, AgriProcessors and the EPA requested court-sponsored mediation. The court granted the request and scheduled mediation before Chief Magistrate Judge John A. Jarvey. NICCW learned of the mediation and asked the court for permission to participate in it. The court granted NICCW's request.

In January of 2005, Magistrate Judge Jarvey conducted nineteen hours of mediation in two days. The United States, NICCW and AgriProcessors participated. The parties were unable to reach an agreement.[4]

In August of 2005, the United States and AgriProcessors resumed settlement negotiations without NICCW. The parties dispute why NICCW did not participate.[5]

---

[4] Settlement negotiations apparently broke down completely, and, on January 31, 2005, AgriProcessors filed a motion to dismiss. In the motion to dismiss, AgriProcessors claimed that the mediation failed because the United States's representatives did not have full settlement authority. As a sanction, AgriProcessors asked the court to dismiss the case with prejudice, impose monetary sanctions on the United States and/or order the United States to come back to the table accompanied by someone with full settlement authority. On August 8, 2005, AgriProcessors withdrew its motion to dismiss.

[5] The United States claims that AgriProcessors wanted to negotiate a separate settlement with the United States, the United States did not object and NICCW agreed to stay out of the negotiations between the United States and AgriProcessors. The United States also claims that it generally kept NICCW abreast of the negotiations and made clear to NICCW that it should try to settle its own claims against AgriProcessors. NICCW states that it asked the United States to participate in the settlement of the United States's
(continued…)

On August 30, 2005, the court set a bench trial on both NICCW's complaint and the United States's Complaint for the three-week period beginning on October 16, 2006. On September 21, 2005, the United States, AgriProcessors and NICCW jointly moved the court to stay the case, in order to allow the United States and AgriProcessors more time to reach a settlement. On October 4, 2005, the court granted the motion in part. The court left the parties free to suspend discovery and pursue settlement negotiations, but declined to continue the trial.

### E. Consent Decree

On August 31, 2006, the United States lodged a proposed consent decree ("Consent Decree") (docket no. 44-2) with the court. The Consent Decree requires AgriProcessors to (1) pay a cash penalty of $590,756 to the United States; (2) spend at least $12,300 on a supplemental environmental project for the purchase of certain emergency response equipment for the City's fire department; and (3) conduct and follow-up with environmental compliance audits at the Plant and another facility AgriProcessors owns in Nebraska. The Consent Decree contains stipulated penalties for non-compliance. AgriProcessors does not admit the violations that are alleged in the United States's Complaint.

On September 8, 2006, the United States filed notice of the Consent Decree in the Federal Register. *See* 71 Fed. Reg. 53132-01 (Sept. 8, 2006) (setting comment period expiring on October 5, 2006). The United States received two comments, including one submitted on behalf of NICCW. The crux of both comments was that the civil penalty is too low.

---

[5](…continued)
Complaint, but the United States denied it permission. AgriProcessors represents to the court that NICCW never approached it to negotiate anything.

On October 12, 2006, the United States filed the Motion. On October 26, 2006, NICCW filed a Resistance. In a separate filing, NICCW informed the court that it did not want to prosecute its complaint any further and its role would be limited to objecting to the Consent Decree. On October 30, 2006, AgriProcessors and the Untied States filed responses to NICCW's Resistance.

On October 30, 2006, the court held a hearing ("Hearing") on the Motion. The United States was represented by Robert Butler, Assistant United States Attorney; Arnold Rosenthal, Senior Counsel, United States Department of Justice; and Patricia Miller, Senior Assistant Regional Counsel, EPA. Attorney Jay Eaton represented AgriProcessors. Attorney Lawrence McLellan represented NICCW.

The Hearing was not an evidentiary hearing. Although the parties and the court discussed the possibility of holding an evidentiary hearing on various occasions, none of the parties formally moved for such a hearing. In any event, the court finds that an evidentiary hearing is not necessary. *See United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1017 (8th Cir. 2002) (holding, in a CERCLA action, that the decision to hold an evidentiary hearing rests within the sound discretion of the district court); *see also United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 94 (1st Cir. 1990) ("In general, . . . evidentiary hearings are not required under CERCLA when a court is merely deciding whether monetary settlements [are] fair and reasonable . . . .").

At the Hearing, the United States offered to provide the court with economic benefit worksheet calculations for the alleged CWA violations for the court's *in camera* review. *See* Exhibit X (economic benefit worksheets). Neither NICCW nor AgriProcessors objected. On October 31, 2006, the court ordered the government to submit the worksheets, and the court received the worksheets on the same date.

## III. REVIEW OF CONSENT DECREE

### A. Legal Standards

The court must review a proposed consent decree for fairness, reasonableness and adequacy. *United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992) (involving a CWA action); *see also United States v. Hercules, Inc.*, 961 F.2d 796, 800 (8th Cir. 1992) (applying same standard in CERCLA action) (citations omitted), *aff'g United States v. Vertac Chem. Corp.*, 756 F. Supp. 1215 (E.D. Ark. 1991); *accord Cannons Eng'g*, 899 F.2d at 85 ("Reasonableness, fairness, and fidelity to the statute are . . . the horses which district court judges must ride.") (involving a CERCLA action and quoted with approval in *BP Amoco*, 277 F.3d at 1018).

Fairness consists of procedural and substantive fairness. *BP Amoco*, 277 F.3d at 1019-20 (examining procedural and substantive aspects of fairness). "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g*, 899 F.2d at 86. "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Id.* at 87.

"A consent decree is not reviewed as a judgment on the merits." *Metro. St. Louis Sewer Dist.*, 952 F.2d at 1044. For example, the court is not required to apply the standards in 33 U.S.C. § 1319(d), which spell out the factors to be used in determining an appropriate civil penalty against a party found to be in violation of the CWA. *Id.* Moreover, "the relevant standard . . . is not whether the settlement is one which the court itself might have fashioned, or considers an ideal . . . ." *Cannons Eng'g*, 899 F.2d at 84.

The law favors settlements that are negotiated in good faith. *Vertac*, 756 F. Supp. at 1218; *see also Angela R. ex rel. Hesselbein v. Clinton*, 999 F.2d 320, 324 (8th Cir.

8

1993) (recognizing same principle in a different context). Settling an enforcement action is a discretionary act on the part of the EPA, *EPA v. City of Green Forest, Ark.*, 921 F.2d 1394, 1402 (8th Cir. 1990), and the EPA has considerable expertise in determining the appropriate settlement. *United States v. Dist. of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996) (involving a CWA action) (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992)). A policy of judicial deference "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." *Cannons Eng'g*, 899 F.2d at 84; *accord United States v. Associated Milk Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976) ("It is axiomatic that the Attorney General must retain considerable discretion in controlling government litigation and in determining what is in the public interest.").

The court must not mechanically "rubber stamp" a proposed consent decree. *BP Amoco*, 277 F.3d at 1019. It must carefully consider the underlying facts and the parties' legal arguments. *Id*. The decision to enter a consent decree is committed to the sound discretion of the district court. *Id*.

### *B. Analysis*

NICCW objects that the Consent Decree is procedurally unfair, because NICCW was "excluded" from the negotiating table. NICCW's self-stated "primary objection" to the Consent Decree, however, is that it is not substantively fair, reasonable and adequate, because the civil penalty is too low. The court considers each objection, in turn. *See United States v. Chevron USA, Inc.*, 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005) ("Courts typically first examine procedural fairness . . . .") (citing *United States v.*

*Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994)).[6]

### 1.     *Procedural Fairness*

The court finds that the Consent Decree is procedurally fair. The United States and AgriProcessors negotiated in good faith and at arms-length. *See BP Amoco*, 277 F.3d at 1019-20 (affirming district court's finding that consent decree was procedurally fair, because there was no evidence that the negotiations were not in good faith or at arms-length). They spent a considerable amount of time, effort and expense negotiating a settlement. *Compare Telluride*, 849 F. Supp. at 1403 (declining to grant motion to enter consent decree because it was filed on the same date the complaint was filed, the United States relied heavily on the defendant's experts, and "unlike many other environmental enforcement cases, [the decree] was not the product of the parties' desire to settle long-running litigation through which the strength and weaknesses of each side's case was revealed"), *with Cannons Eng'g*, 899 F.2d at 81 ("Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table."). The process was full of "adversarial vigor." *See id.* at 87 n.4 ("To the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness." (Citations omitted.)).

The court rejects NICCW's argument that the Consent Decree is procedurally unfair, because NICCW did not participate in all of the settlement negotiations. NICCW

---

[6] NICCW also contends that the Consent Decree is procedurally unfair because the United States has not disclosed all of its internal settlement calculation worksheets, including information about precisely how many violations AgriProcessors is settling, the severity of those violations and the United States's assessment of its own litigation risks. Because this argument dovetails with NICCW's primary argument that the Consent Decree is not substantively fair, reasonable or adequate, the court discusses it *infra* in Part III.B.2.

does not point to a statutory or constitutional provision that grants it such a right. In any event, there is no evidence that the United States acted in bad faith or committed malfeasance in conducting settlement negotiations without NICCW. *See Sam Fox Publ'g Co. v. United States*, 366 U.S. 683, 689 (1961) ("Sound policy would strongly lead us to decline . . . to assess the wisdom of the Government's judgment in negotiating and accepting the . . . Consent Decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting.").

Even if the court were to assume that NICCW was unwillingly excluded from the negotiating table (a contested issue of fact upon which neither party has offered evidence), the United States and AgriProcessors were free to negotiate with whomever they chose. *Cannons Eng'g*, 899 F.2d at 93 ("So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses."). AgriProcessors was free to negotiate a settlement of the United States's Complaint before negotiating a separate settlement with NICCW. *See id.* ("[T]he right to . . . structure the order and pace of settlement negotiations to suit, is . . . [a party's] prerogative . . . ."). NICCW remained free to pursue or attempt to settle its own complaint against AgriProcessors, but NICCW chose not to do so.[7] Indeed, NICCW implicitly acquiesced in the bilateral nature of the negotiations between the United States and AgriProcessors when it formally joined in a motion to stay the case to further those negotiations.

In any event, NICCW participated in some of the settlement negotiations and its interests were represented during all of the negotiations. The court granted NICCW leave to participate in the nineteen-hour court-sponsored mediation, and NICCW participated in

---

[7] At various stages in this litigation, the court made clear that each plaintiff was free to take its own case to trial.

it. Even when not personally present at the negotiating table, NICCW's interests were represented, because the United States represents the interests of all citizens at the negotiating table. *Cf. United States v. Union Elec. Co.*, 64 F.3d 1152, 1170 (8th Cir. 1995) (stating, in a CERCLA action, that the EPA represents "the general interest of the United States in providing for the clean up of polluted sites").

### 2. *Substantive Fairness, Reasonableness and Adequacy*

The court finds that the Consent Decree is substantively fair, reasonable and adequate. The civil penalty imposed in this case, approximately $600,000, is substantial. At the Hearing, the United States represented to the court that, of this amount, $400,000 represents the economic benefit to AgriProcessors from the CWA violations, that is, the avoided and/or delayed costs of compliance; $5000 represents the economic benefit from the EPCRA and CAA violations; and $195,000 is a gravity amount for the CWA, CAA and EPCRA violations.

The civil penalty in the Consent Decree is considerably more than the civil penalties imposed against the City and Iowa Turkey Products, another corporation that allegedly illegally dumped its wastewater into the POTW. *See generally United States & NICCW v. City of Postville*, No. 04-CV-1040-LRR (N.D. Iowa Jan. 3, 2005) (imposing civil penalty and other payments totaling more than $60,000); *United States v. Iowa Turkey Products, Inc.*, No. 04-CV-1045-LRR (N.D. Iowa Jan. 10, 2005) (imposing, among other things, a $80,000 civil penalty and a $20,000 payment to the National Resource Damage Assessment Restoration Fund).[8] The greater civil penalty imposed against AgriProcessors appropriately reflects the relative strength of the United States's case and the number and seriousness of the violations in the United States's Complaint.

---

[8] NICCW did not object to these less substantial settlements.

In arguing the Consent Decree is not substantively fair, reasonable or adequate, NICCW contends that the United States has not disclosed all of its internal settlement calculation worksheets, including information about precisely how many violations AgriProcessors is settling, the severity of those violations and the United States's assessment of its own litigation risks. To the extent such information is available, NICCW criticizes the United States's rationale for agreeing to a $600,000 civil penalty, including its economic benefit and litigation risk calculations, and offers alternative methods for determining an appropriate penalty. NICCW examines the 33 U.S.C. § 1319(d) factors and compares the proposed civil penalty with much higher penalties imposed after trial in a number of other cases. NICCW opines that the United States has "a very strong case" should it go to trial and the maximum penalty AgriProcessors faces would exceed $100 million.

As a threshold matter, the court finds that it possesses sufficient information to evaluate the Consent Decree. This case is readily distinguishable from those rare instances in which courts have declined to enter consent decrees because of lack of sufficient information. *Cf. United States v. Wal-Mart Stores, Inc.*, No. Civ.A.04-301-GMS, 2004 WL 2370700 (D. Del. Oct. 14, 2004) (reserving ruling on motion to enter until the parties provided the court with more information, because the United States had provided the court "with barely more than one page of explanation" and the proposed decree "impose[d] a complex web of restrictions" that would "affect nearly every state in the Union"). When, as here, the defendant does not admit any liability, evaluating a consent decree is an imperfect exercise. "[P]recise data relevant to determining the total extent of harm caused and the role [of a potentially responsible party] is often unavailable." *Cannons Eng'g*, 899 F.2d at 88. As a consequence, often "[t]he court's approval is 'nothing more than an amalgam of delicate balancing, gross approximations and rough justice.'" *United*

*States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (quoting *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

The court recognizes that there may be multiple methods of determining an appropriate civil penalty, including different methods of calculating the economic benefits of noncompliance. To show that the Consent Decree is substantively fair, reasonable and adequate, however, the United States need not show that it is the best possible settlement. *See Cannons Eng'g*, 899 F.2d at 88 (characterizing, in a CERCLA action, an argument that the government should have used a different method of determining liability as "a stalking horse" and "second-guessing"). Moreover, the court cannot "reach beyond the complaint to evaluate claims that the government did not make and to inquire as to why they were not made." *Id.* at 1459. The court declines NICCW's invitations to require the best possible settlement[9] and reach beyond the Complaint.[10]

In any event, NICCW focuses too narrowly on the monetary amount of the settlement. Drawing comparisons to amounts awarded in other cases is an inherently risky exercise, because environmental actions such as these are notoriously fact-specific. Other aspects of the Consent Decree are important in this case, which inform the court's assessment of its fairness, reasonableness and adequacy. For example, AgriProcessors has agreed to conduct environmental compliance audits at both the Plant and its new Nebraska facility. If those audits reveal any non-compliance, AgriProcessors is required to rectify

---

[9] For example, NICCW contends that the court should consider that AgriProcessors was able to delay the construction of a new $100 million mechanical treatment plant. Constructing a new mechanical treatment plan, however, was not the least restrictive means to bring AgriProcessors into compliance with the CWA.

[10] For example, NICCW discusses AgriProcessors's ammonia discharges as a basis for a higher civil penalty. Ammonia discharges are beyond the scope of the Complaint. The Permit did not contain limits on ammonia discharges.

14

those problems. The Consent Decree thus adequately ensures that AgriProcessors will comply with the nation's environmental laws and forestall any future environmental damage.[11] *Cf. Dist. of Columbia*, 933 F. Supp. at 51 (finding decree that imposed only injunctive relief was reasonable because it traded possible compensation for past harms in favor of certainty of future compliance and forestalling future harm). Even if extracting a monetary sum from AgriProcessors were the only goal the United States could pursue in crafting a settlement, it is worth noting that these audits and potential follow-up will undoubtedly cost AgriProcessors money.

Finally, the court declines to review the Consent Decree as if it were a judgment on the merits[12] or confine its analysis to the 33 U.S.C. § 1319(d) factors. *See Metro. St. Louis Sewer Dist.*, 952 F.2d at 1044 (stating that "[a] consent decree is not reviewed as a judgment on the merits" and holding that a district court is not required to apply the standards in 33 U.S.C. § 1319(d)). As one court has explained:

> [T]he function of the reviewing court is not to substitute its judgment for that of the parties to the decree . . . . "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the

---

[11] The Consent Decree does not provide for injunctive relief. At the Hearing, it became clear that such injunctive relief was unnecessary. It appears there are currently no problems at the Plant, and the mechanical treatment plant is on line. This new mechanical treatment plant is, of course, outside of the scope of the Complaint. Notably, the Consent Decree binds AgriProcessors for matters outside the purview of the Complaint.

[12] The court declines to compare the $600,000 civil penalty with the penalties imposed in cases that went to trial. To the extent comparisons with other cases are possible, the court notes that the settlement amount is more than the settlements approved in other cases. *See* Exhibit A to Response (docket no. 55-2) (listing 12 settlements, all with civil penalties of less than $525,000).

> parties each give up something they might have won had they proceeded with litigation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." [*Citizens for a Better Env't v. Gorsuch*,] 718 F.2d [1117,] 1124 [(D.C. Cir. 1983)] (quoting *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236 n. 10[] (1975)).
>
> . . . .
>
> "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, . . . ." *Id.* at 1126. "[I]t is precisely the desire to avoid protracted examination of the parties' legal rights which underlies consent decrees." *Id.* And "[i]t is therefore inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial. Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted." *United States v. Microsoft Corp*[.], 56 F.3d 1448, 1461 (D.C. Cir. 1995).

*Dist. of Columbia*, 933 F. Supp. at 46-47 (involving a CWA action).

### *3. Conclusion*

In sum, the court finds that the Consent Decree is procedurally and substantively fair, reasonable and adequate.

## *IV. DISPOSITION*

The court **GRANTS** the Motion (docket no. 51). The court shall separately sign and file the Consent Decree. The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

**DATED** this 29th day of November, 2006.

_____
LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA